IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:12-CV-303-FL

| | |
|---|---|
| JUDY WATKINS BAYSDEN, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings

[DE-29, DE-33] pursuant to Fed. R. Civ. P. 12(c). Claimant Judy Watkins Baysden ("Claimant")

filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial

of her applications for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending

motions are ripe for adjudication. Having carefully reviewed the administrative record and the

motions and memoranda submitted by the parties, this court recommends denying Claimant's

Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings

and upholding the final decision of the Commissioner.

## I. STATEMENT OF THE CASE[1]

Claimant protectively filed an application for a period of disability, DIB and SSI on August

---

[1] Claimant previously filed applications for benefits on August 8, 2006, alleging disability beginning March 18, 2006.
(R. 82). Both claims were denied initially and upon reconsideration. *Id.* A hearing before the Administrative Law Judge
("ALJ") was held March 5, 2009, and the ALJ issued a decision denying Claimant's request for benefits on April 14,
2009. (R. 79-93). Claimant did not appeal this decision making this the final decision of the Commissioner for the
period of March 18, 2006 through April 14, 2009.

7, 2009, alleging disability beginning March 18, 2006. (R. 187-95). Both claims were denied initially and upon reconsideration. (R. 104-16, 120-28). A hearing before the ALJ was held on September 13, 2011, at which Claimant proceeded *pro se* and a witness and a vocational expert ("VE") appeared and testified. (R. 44-78). On January 6, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 24-36). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 17-18), and submitted additional evidence as part of her request (R. 936-2146). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on October 9, 2012. (R. 6-14). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171,

2

176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3),

3

416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) improper assessment of Claimant's credibility; (2) improper evaluation of the medical opinion evidence; and (3) improper assessment of Claimant's residual functional capacity ("RFC"). Pl.'s Mem. [DE-30] at 10-20.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 26). Next, the ALJ determined Claimant had the following severe impairments: kidney stones with ureteropelvic junction obstruction, chronic upper respiratory infection, residuals of a hysterectomy with pelvic pain, residuals of a colectomy, bipolar disorder, lumbar spondylosis and diabetes mellitus. (R. 26-27). The ALJ also found Claimant had a nonsevere impairment of borderline intellectual functioning. (R. 27). However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 27-29). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restriction in her activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace with no episodes of decompensation. (R. 28).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to

perform simple, routine repetitive light work as defined in 20 CFR 404.1567(b) and

4

416.967(b) with a thirty-minute interval sit/stand option. The undersigned also determines that the claimant should never climb ropes, ladders or scaffolds and only occasionally climb ramps and stairs. Occasional balancing, stooping and kneeling, never crouching or crawling. She would have to avoid concentrated exposure to hazards. She would be limited to frequent, not constant use of the upper extremities for fine and gross manipulations. She would be limited to simple routine, repetitive tasks, in that she can apply commonsense understanding to carry out oral, written and diagrammatic instructions. She can occasionally interact with the public but is frequently able to interact with co-workers.

(R. 29).[2] In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 29-34). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a nurse's assistant. (R. 34). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. *Id.*

**B.     Claimant's Testimony at the Administrative Hearing**

At the time of Claimant's administrative hearing, Claimant was 41 years old and unemployed. (R. 187). Claimant attained an 11th grade education, but did not obtain her GED. (R. 55-56). Claimant obtained a CNA certification and worked as a CNA (or nurse's assistant) for approximately 14 years, although Claimant's certification has been expired now for approximately two years. (R. 55, 59). Claimant currently lives alone in an apartment because her daughter moved out in July 2011 and Claimant's father pays her bills. (R. 54).

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

Claimant explained numerous medical conditions supporting her disability claim and her inability to work full-time. These medical conditions include chronic abdominal and back pain, lumbar spondylosis, uncontrolled diabetes causing extremity numbness, abdominal adhesions, dizziness, a liver mass, urinary tract infections, pelvic abnormalities, diverticular colon disease, diarrhea and depression. Claimant has not had surgery regarding her back pain and only receives physician treatment when she goes to the emergency room with severe episodes of pain. (R. 55). Claimant is not on a regular pain medication, but has received Percocet in the past at the emergency room. (R. 60). Claimant testified that she has been unable to get treatment for her back because she does not have medical insurance and the pain is worsening. (R. 56). Claimant estimates that her pain is twice as bad since her diabetes diagnosis in June 2011 and states she in "a lot of pain all the time." (R. 56, 59). Claimant has difficulty bending over, but she can walk and climb the stairs in her apartment although it is becoming more difficult. (R. 58). Claimant estimates she can sit for 30 minutes before needing to move and stretch. (R. 59). Claimant shops for groceries one to two times per month. (R. 64). Claimant also drives, does her laundry, and cleans her house when she is not in pain. (R. 65). Claimant's grandchildren come to her apartment once or twice each week, but she does not watch them alone. *Id.* Also, Claimant's sister comes to take her to eat once in a while and that is the only time she eats out. *Id.*

Since 2001, Claimant has undergone approximately eight abdominal surgeries, including a gallbladder removal, a hysterectomy, a colon resection, and other procedures addressing massive adhesions, cysts, endometriosis, and other conditions. (R. 57, 77). Claimant testified that her abdominal pain is the result of scar tissue from earlier surgeries. (R. 57). Claimant has had numerous laparoscopies to clean up the scar tissue and had a surgery in the 1990s for her pelvic

6

adhesive disease. (R. 57, 62-63). Claimant has also been diagnosed with pelvic adhesive disease that causes pain and makes her crampy constantly. (R. 62-63). Recently, Claimant has experienced a lot of dizziness and has gone to the emergency room for severe dizziness that may cause her to faint. (R. 59). Claimant's diverticulitis causes her to experience diarrhea and pain. (R. 77). Claimant has had recurrent urinary tract infections for the past two years and goes to the emergency room for treatment where she receives an antibiotic, shots and fluids. (R. 61). Claimant was diagnosed with diabetes in June 2011, but has only received insulin in the emergency room and has not visited with a physician for regular treatment or medication because she does not have the money. (R. 56). Claimant testified that her diabetes is not under control and her sugar readings have been high. (R. 59-60). In the three months before the hearing, Claimant lost 23 pounds and now weights 115 pounds. (R. 56-57). Claimant testified that she experiences numbness in her hands and legs from her diabetes since being diagnosed. (R. 66). Claimant stated she had prescriptions for cramps and dizziness, but did not get them filled. *Id.* Claimant has a mass on her liver that she has had for years, but the mass was recently observed and cautioned about in an examination. (R. 60).

Claimant has also experienced depression for several years. (R. 61). She currently takes Paxil, which was prescribed in the ER, but testified she has not been able to find a medication that works. *Id.* Claimant received treatment at Port Human Services in Kinston for approximately six months, but could not continue to afford the treatment. *Id.* Claimant testified that when she is depressed, she just wants to sleep. (R. 63). Claimant stated that she was diagnosed as bipolar, but does not believe she is bipolar, speculating instead that she has ADHD. *Id.* Claimant has difficulty focusing and has multiple things on her mind at one time. (R. 64).

7

## C. Witness' Testimony at the Administrative Hearing

Debra Morton, Claimant's sister, testified at the administrative hearing. (R. 67-72). Ms. Morton has helped support Claimant, along with Claimant's father, for the past eight years. (R. 72). Ms. Morton sees Claimant twice per week when she drives to Claimant's house. (R. 67). Ms. Morton stated that Claimant was "real bad off" with postpartum depression for several years after having children in the 1990s and, during that time, was found with a gun which was out of character, but that Claimant did not threaten to harm the children, only herself because she did not have a desire to live. (R. 67-69). Claimant was weak, had difficulty getting out of bed, and experienced crying fits. (R. 69). Ms. Morton stated the Claimant has not been able to get out of bed for almost 10 years due to depression and lives like a hermit. (R. 69-70).

Ms. Morton tries to take Claimant to dinner when she visits and when they went to dinner last, Claimant sat with her back to the people in the restaurant and, that same night, remained in the car while Ms. Morton went into the grocery store. (R. 70-71). Ms. Morton also testified that Claimant has pain when she urinates and was hospitalized recently for a week due to high blood sugar. (R. 71). Claimant complains to Ms. Morton of being clammy and sweaty and experiencing numbness and tingling in her hands and feet with her diabetes. *Id.* Claimant also has blurred vision, has lost weight in the past year and has thinning hair. *Id.* Ms. Morton testified that Claimant goes to the doctor once or twice a month with something wrong. (R. 72).

## D. Vocational Expert's Testimony at the Administrative Hearing

Ashley Johnson testified as a VE at the administrative hearing. (R. 72-77). After the VE's testimony regarding Claimant's past work experience (R. 74), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed

8

two hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the following:

[A]ssume this individual is limited to 10 pounds frequently, 20 pounds occasionally. This individual can sit, stand and/or walk about six hours in an eight hour day but will need a sit/stand option for 30 minutes. This individual should never climb ladders, ropes and scaffolds; occasional ramps and stairs; occasional balancing, stooping, kneeling; never crouching, never crawling. This individual would be limited to frequent, not constant, use of the upper extremities for fine and gross manipulation. This individual would have to avoid concentrated exposures to hazards and by that I mean unprotected heights and unprotected machinery. As a result of pain and/or mental limitations, this individual would be limited to simple, routine, repetitive tasks and by that I mean they could carry out, use common sense to understand and carry out oral, written, and diagrammatic instructions. This individual would be limited to occasional contact with the public; frequent contact with co-workers and would need a low stress type job.

(R. 75). The VE responded that the individual could not perform Claimant's past work. *Id.* The ALJ next asked if there was any other work that the individual could perform. *Id.* The VE responded that the individual could perform the jobs of small parts assembler (DOT # 706.684-022), electronics worker (DOT # 726.687-010), and shipping/receiving weigher (DOT # 222.387-074). (R. 76). The ALJ next asked the VE whether the same hypothetical individual, having the additional limitation of being absent from work more than two days per month, would be employable at any exertional level. *Id.* The VE responded in the negative. *Id.*

## V. DISCUSSION

### A. The ALJ's Assessment of Claimant's Credibility

Claimant contends the ALJ improperly discounted Claimant's credibility. Pl.'s Mem. at 10-16. Specifically, Claimant contends the ALJ's use of boilerplate language fails to satisfy the ALJ's obligation to give specific reasons for his credibility finding and that the ALJ improperly discounted Plaintiff's credibility based on her medical non-compliance. *Id.* Claimant refers to standard

9

template language, commonly used by the Social Security Administration ("SSA"), wherein the ALJ stated that "the claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above functional capacity assessment." In support of her argument, Claimant cites to a Seventh Circuit decision, *Parker v. Astrue*, 596 F.3d 920 (7th Cir. 2010), in which the template language was criticized. Pl.'s Mem. at 12.

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). Federal regulations 20 C.F.R. §§ 404.1529(a), 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *See Craig*, 76 F.3d at 593-94. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.*; *see also* SSR 96-7p, 1996 WL 374186, at \*2 (July 2, 1996). If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *See Craig*, 76 F.3d at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other than medication, for relief of pain or other symptoms and functional

10

restrictions. *Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at \*3. The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See Craig*, 76 F.3d at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at \*3.

The court first considers Claimant's contention that the ALJ erred by including boilerplate credibility language. This court has previously addressed the Seventh's Circuit critique of "boilerplate" credibility language, but noted that such cases do not stand for the proposition that the ALJ's use of boilerplate language requires remand when the ALJ has otherwise explained his conclusion adequately. *Mascio v. Colvin*, No. 2:11-CV-65-FL, 2013 WL 3321577, at \*3 (E.D.N.C. July 1, 2013). Here, the ALJ adequately explained his credibility determination by providing a thorough recitation of the medical evidence and reasons for his finding, and his determination is supported by substantial evidence. Moreover, Claimant acknowledges in her brief that the ALJ "followed his boilerplate observation on credibility with a recitation of the evidence in the record." Pl.'s Mem. at 12. Accordingly, the ALJ did not err by using language Claimant describes as "boilerplate."

Here, the ALJ considered Claimant's subjective complaints and found that Claimant had medically determinable impairments reasonably capable of causing Claimant's subjective symptoms, but concluded Claimant's subjective complaints were not fully credible. (R. 30). In reaching this conclusion, the ALJ generally noted the following while discussing medical evidence from various medical providers: (1) diagnostic and objective test results were essentially normal or showed mostly

11

mild complication in the right kidney and mild or no obstruction; (2) medical evidence indicated that Claimant's conditions improved with treatment when Claimant was compliant; (3) reports indicated that Claimant refused to take her medication, had significant lapses in treatment and was non-compliant with treatment instructions; (4) physical observation noted good mobility and full range of motion; and (5) Claimant was independent in performing activities of daily living. (R. 30-34).

Claimant specifically contends that the ALJ erred by considering Claimant's non-compliance with medical treatment or lack of regular treatment by medical providers. Claimant first relies on SSR 96-7p and contends that the ALJ drew negative inferences from Claimant's failure to seek regular medical treatment without considering Claimant's explanations as to the infrequent or irregular treatment, which SSR 96-7p prohibits. Pl.'s Mem. at 13. The administrative hearing transcript in this case indicates that the Claimant provided the ALJ with reasons for her lack of consistent medical treatment and non-compliance, including a lack of funds, lack of insurance, not finding an effective medication, and belief in an incorrect diagnosis of bipolar disorder. (R. 54, 56, 60-61, 63-64, 66). Therefore, the ALJ did not blindly draw a negative inference of Claimant's credibility based on non-compliance or other treatment irregularities without considering explanations as to the cause for such non-compliance or non-treatment. The ALJ was aware of Claimant's explanations regarding these credibility issues and appropriately considered them in his determination. Nothing in SSR 96-7p mandates that an ALJ accept a claimant's explanations or rule out non-compliance or non-treatment as factors weighing against a claimant's credibility simply because explanations are provided; SSR 96-7p only requires the ALJ to consider the underlying reasons for the occurrence. Here, the ALJ was knowledgeable of Claimant's explanations and, while Claimant may disagree with how he weighed these explanations, the ALJ did not commit error under

12

SSR 96-7p.

Claimant further contends the ALJ impermissibly penalized Claimant for not receiving medical treatment based on a lack of funds theory. Pl.'s Mem. at 13-14. However, a review of the ALJ's opinion does not indicate to the court that the ALJ discounted Claimant's credibility based on her lack of funds to seek medical treatment or obtain medication. Specifically, there is no indication the ALJ discredited Claimant because she frequently sought treatment at local emergency rooms instead of through specialists and primary care physicians. Rather, the ALJ's reliance on non-compliance and non-treatment in discounting Claimant's credibility is based on her refusal to comply with treatment instructions, specifically her recurring refusal to take medication at all, or to take medication in accordance with physician instruction. (R. 31-33). The ALJ cited the following instances where medical providers noted Claimant's willful non-compliance for non-monetary reasons: (1) medical reports from Goshen Medical Center in 2011 indicate Claimant was not compliant in taking her medications (R. 31, 906-09) (noting Claimant refused to take her medications and is not following physician instructions); (2) medical reports from Duplin General Hospital in 2011 indicate Claimant is not taking her prescribed medications (R. 32, 761, 846, 859) (noting Claimant choosing on her own accord not to take prescribed medications); and (3) medical reports from Pitt Memorial Hospital in 2011 noting Claimant was non-compliant with treatment instructions (R. 32, 774-76, 782) (noting Claimant has repeatedly been non-compliant with her UTI antibiotics by not completing the full antibiotic course or refusing other medications). Notably, three medical offices or hospitals, each with voluminous treatment notes regarding Claimant, recognized

13

Claimant's non-compliance with medication regimens.[3] Further review of the treatment records reveal that Claimant was frequently provided with medication by the hospitals or providers and did not have difficulty in obtaining medication when needed, further emphasizing Claimant's non-compliance was commonly for non-monetary reasons. *See* (R. 678-79, 1245-46) (Claimant was given Bactrim because unable to get urine infection medication filled); (R. 774-79, 1601-03, 1957-59) (Claimant was sent home with ciprofloxacin); (R. 715) (Claimant given Septra and Ultram); (R. 1241) (Claimant given Septra and Percocet). Here, Claimant has not demonstrated that the ALJ improperly penalized her based on a lack of funds and the ALJ did not discount Claimant's credibility solely based on a medical non-compliance, but provided additional reasons as to why he found her complaints less than credible. Based on the foregoing, Claimant's contention that the ALJ should not have considered her non-compliance as a factor that weighed against her disability claim is without merit.

Claimant next contends that the ALJ failed to address how Claimant's mental impairments and desire not to be dependent on pills prevented her from taking her medications. Pl.'s Mem. at 14-15. As to Claimant's argument that her mental impairments contributed to her inability to adhere to medication regimens, Claimant has not cited, and the court cannot locate, any evidence of record supporting the contention that there is a connection between Claimant's non-compliance and her mental impairments. One physician noted that Claimant "refuses to understand" the consequences of diabetes and diagnosed "denial," however, none of the medical providers noted any mental

---

[3] Notes from Lenoir Memorial Hospital, another of Claimant's medical providers, likewise indicate Claimant refused medication. *See* (R. 814-16) (refusing Ibuprofen and Ultram). Claimant also left Lenoir Memorial Hospital against medical advice before final disposition which included her prescriptions and discharge instructions. *See* (R. 803) (noting that Claimant was "somewhat a difficult patient"); (R. 1555, 1563) (noting Claimant was adamant about leaving).

14

deficiency concerning Claimant's ability to otherwise understand her medical treatment. (R. 906-07). In fact, it is noted in the record that Claimant was not significantly limited in her ability to understand and remember very short and simple instructions and only moderately limited in understanding and remembering detailed instructions. (R. 571, 735). Additionally, Claimant testified at the administrative hearing that she does not have her diabetes under control and acknowledged the potential organ damage she can suffer as a result of uncontrolled diabetes demonstrating she can understand her illnesses and the information communicated to her by medical providers. (R. 59). Here, the court will not speculate on matters not objectively present in the record evidence and Claimant has provided no support for this contention. Therefore, Claimant's argument is without merit. *See King v. Astrue*, No. 5:08-CV-527-D, 2009 WL 4827413, at *9-10 (E.D.N.C. Dec. 10, 2009) (adopting memorandum and recommendation) (rejecting claimant's argument that claimant's alleged lack of mental ability prevented him from complying with physician instructions because no physician noted an inability to understand "his illnesses, treatment, or medications specifically, or his [in]ability to understand or take directions generally"). Additionally, Claimant's argument that the ALJ failed to consider her desire not to be dependent on pills is not persuasive.

Last, Claimant briefly argues the ALJ failed to adequately develop the record concerning Claimant's reasons for not taking her medication. Pl.'s Mem. at 15-16. Claimant does not specify how the ALJ should have further developed the record except to generally contend there was a duty to further explore Claimant's reasons for not taking her medications. The ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). This is especially true in the case of a *pro se* claimant,

15

where the ALJ has a "heightened duty of care and responsibility." *Crider v. Harris*, 624 F.2d 15, 16 (4th Cir. 1980). Although a claimant has a duty to diligently supply medical records to the SSA documenting the claimant's impairments and limitations, the ALJ bears the responsibility of developing the claimant's "complete medical history." 20 C.F.R. §§ 404.1740(b), 416.912(d); *see Smith v. Barnhart*, 395 F. Supp. 2d 298, 302 (E.D.N.C. 2005). However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Here, the court's review indicates that the ALJ fulfilled his duty to develop the record. The ALJ questioned Claimant more than once concerning the identity of her medical providers and any missing records to ensure he had a full and complete record of her treatment history. (R. 48-51, 54, 60). The ALJ also questioned Claimant's sister, Ms. Morton, at the hearing concerning the list of Claimant's medical providers. (R. 77-78). Records from all the medical providers named by Claimant and Ms. Morton appear in the administrative record, and include treatment records dated up to the month of the administrative hearing. (R. 285-935). Moreover, Claimant testified in the hearing to not taking medication and the ALJ adequately questioned Claimant about her impairments, specifically reminding Claimant that she was the best person to describe to the ALJ her medical problems. (R. 62).

In sum, the ALJ properly evaluated Claimant's complaints and his credibility determination is supported by substantial evidence. *See Mastro*, 270 F.3d at 176 (holding that in conducting the substantial evidence inquiry the court is not to re-weigh the evidence). Accordingly, Claimant's argument is without merit.

16

**B. The ALJ's Assessment of the Medical Opinion Evidence**

Claimant contends the ALJ erred in evaluating the medical opinion evidence. Pl.'s Mem. at 16-19. Specifically, Claimant contends the ALJ erred in assigning only little weight to the opinions of Onslow Carteret Behavioral Healthcare Services ("Onslow Services"), Tarheel Human Services ("Tarheel Services"), and Port Human Services ("Port Services"). *Id.* This court disagrees.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2)

17

Case 4:12-cv-00303-FL Document 42 Filed 02/28/14 Page 17 of 24

the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.[4] *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), she must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). Moreover, when considering the findings of state agency consultants, the ALJ must

> evaluate the findings using relevant factors . . . , such as the [consultant's] medical specialty and expertise in [the Social Security Administration's] rules, the supporting evidence in the case record, supporting explanations provided by the [consultant], and any other factors relevant to the weighing of the opinions.

20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). The ALJ must explain the weight given to these opinions in her decision. *Id.*; *see also* SSR 96-6p, 1996 WL 374180, at *1.

The three opinions Claimant contends should have been accorded greater weight include the following: (1) an Onslow Services opinion in February 2009 diagnosing Claimant with major depressive disorder and assigning a GAF score of 40 (R. 477-92); (2) a Tarheel Services opinion in August 2009 diagnosing Claimant with bipolar disorder with no psychotic features and assigning a GAF score of 45 (R. 554-62); and (3) a Port Services opinion in August 2010 diagnosing Claimant with bipolar disorder and assigning a GAF score of 35 (R. 935). In discussing the Onslow Services opinion, the ALJ noted that a GAF score of 40 (indicating major symptoms) had been assigned, yet assigned little weight because of the inconsistent examination findings and other conclusions within

---

[4] The Social Security regulations provide that all medical opinions, including opinions of examining and non-examining sources, will be evaluated considering these same factors. 20 C.F.R. §§ 404.1527(e), 416.927(e).

18

the same opinion report. The Onslow Services opinion appears in the only treatment note of record from this provider, an Admission and Eligibility Assessment completed by Johnny Williams, M.D. The ALJ cited the following findings from the Onslow Services report:

[I]t was determined that the claimant's depression was only moderate in severity. In addition, the claimant exhibited an appropriate attitude/affect/mood, normal motor activity, coherent thought processes, normal thought content, fair adaptive functioning/impulse control and full sphere (time, person, place, situation) orientation; which indicated that the claimant was able to mentally function, on some level.

(R. 33). The ALJ discounted the opinion, which primarily is a single GAF score, because the summarized findings indicate only moderate depression and a stable mental processes otherwise, which do not support the low GAF score assigned. Therefore, the ALJ appropriately considered this opinion and did not err.

Next, the opinions by Tarheel Services and Port Services were also assigned little weight because the providers examined Claimant infrequently–Tarheel Services examining Claimant twice and Port Services completing only one intake evaluation–and the opinions were inconsistent with the other evidence of record. (R. 33-34). Again, these opinions consist solely of a GAF score and both of these providers assigned Claimant a GAF score representing a significant level of impairment. Claimant contends these providers constitute the bulk of the medical evidence relating to Claimant's mental impairments, and it was error to assign little weight because these opinions are consistent in supporting a lower GAF score.[5] Pl.'s Mem. at 18-19. The ALJ considered these GAF

---

[5] The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994). A GAF score between 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF scored between 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.*

scores, but ultimately was not persuaded that they accurately reflected Claimant's level of functioning given the record evidence.

A review of the records, including those occurring before the prior ALJ decision, support the ALJ's decision to assign little weight. First, the majority of medical evidence of record relates to Claimant's physical conditions and there is no consistent treatment, even from the mental health providers being discussed presently, evidencing the degree of impairment Claimant alleges. Additionally, the ALJ's earlier discussion of mental impairment listings shows that he assigned significant weight to the Psychiatric Review Techniques performed in October 2009 and February 2010. (R. 28). Both of these assessments indicate Claimant has only moderate limitation in concentration, persistence or pace and mild limitation in daily activities. (R. 585, 749); *see Parker v. Astrue*, 792 F. Supp. 2d 886, 896 (E.D.N.C. 2011) (finding moderate concentration difficulties and mild restrictions in activities of daily living and social functioning consistent with the ALJ's determination that claimant could perform simple, routine and repetitive tasks) (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("The ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [claimant's] deficiencies in concentration, persistence or pace."); *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997) (holding that hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace)). Moreover, Dr. Kohli opined in his examination of Claimant that Claimant could perform simple, routine, repetitive tasks, as evidenced by her performance of housework and intact cognition, and this corresponds to his finding that Claimant can still function despite her mental impairments which produce limitations in concentration. (R. 564-65). Claimant faults the ALJ for assigning

20

significant weight to Dr. Kohli's opinion because he also only examined Claimant on one occasion evidencing limited treatment like Tarheel Services and Port Services. However, Claimant's argument invites this court to re-weigh the evidence, which it may not do. *See Craig*, 76 F.3d at 589 (noting that the court's duty is not to re-weigh conflicting evidence, but determine whether substantial evidence supported the ALJ's decision to assign the resulting weight to the opinion). The opinions from Tarheel Services and Port Services appear in form questionnaires, both initial evaluations, which are arguably entitled to little weight due to the lack of explanation and the opinions are largely GAF scores without a further explanation as to Claimant's level of functioning. *See Nazelrod v. Astrue*, No. BPG-09-0636, 2010 WL 3038093, at \*6 (D. Md. Aug. 2, 2010) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)) ("Form reports in which a physician's obligations [sic] is only to check a box or fill in a blank are weak evidence at best.") (alteration added). Here, the ALJ appropriately weighed the evidence with respect to these opinions and explained his reasons for the weight determinations. Accordingly, the ALJ did not err and Claimant's argument is without merit.

## C.     The ALJ's RFC Assessment

Claimant contends the ALJ failed to consider the combined effect of all of Claimant's impairments, specifically arguing that the ALJ did not consider how Claimant's bipolar disorder and depression impact her ability to pursue medical care for her physical conditions. Pl.'s Mem. at 19-20. The Commissioner argues that Claimant "misconstrues the duty of the ALJ to consider the combined effect of all of [Claimant's] impairments" and that the ALJ's findings with regard to Claimant's RFC are supported by substantial evidence. Def.'s Mem. [DE-34] at 21. The court agrees.

21

An individual's RFC is defined as that capacity which an individual possesses despite the limitations caused by his physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment is based on all the relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *5. When a claimant has a number of impairments, including those deemed not severe, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments."). Sufficient consideration of the combined effects of a claimant's impairments is shown when each is separately discussed by the ALJ and the ALJ also discusses Claimant's complaints and activities. *See Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7.

Here, the court has already found that the ALJ's credibility determination and weighing of the medical evidence was supported by substantial evidence. Both of these determinations ultimately factor into the ALJ's RFC determination. Claimant heavily contends the ALJ's RFC determination should have accounted for how Claimant's mental impairments impact her ability to seek and comply with medical care for her physical conditions. However, Claimant previously raised this argument as it related to Claimant's credibility and the court dismissed the argument because

Claimant has not cited, and the court cannot locate, any evidence of record supporting the contention that there is a connection between Claimant's non-compliance with treatment of her physical conditions and her mental impairments. *See supra* section V.A. The court also rejects Claimant's argument as presented here. The ALJ thoroughly evaluated the medical evidence of record, providing a thorough summary of the objective findings and treatment from all the medical providers that examined and treated Claimant, spanning before and after the prior ALJ decision. Moreover, the ALJ considered Claimant's complaints of pain and other symptomology. *See Baldwin*, 444 F. Supp. 2d at 465 (noting that an ALJ sufficiently considers the combined effects of a claimant's impairments when he separately discusses each impairment and claimant's complaints). There is no evidence for the ALJ to discuss or rely on, even in Claimant's own testimony, that connects Claimant's mental impairments to an inability to pursue or receive medical treatment.

Moreover, Claimant's contention that the ALJ needed to further develop the record to "examine the interrelationship among Claimant's mental and physical impairments" has no merit. The ALJ confirmed at the administrative hearing who Claimant's medical providers were and the record contains numerous pages of treatment notes from these very providers covering a span of years. Claimant also fails to argue how further development of the record would evidence this alleged "interrelationship." *See Zook v. Comm'r of Soc. Sec.*, No. 2:09-CV-109, 2010 WL 1039456, at *4 (E.D. Va. Feb. 25, 2010) ("Prejudice can be established by showing that . . . the additional evidence might have led to a different decision.") (quoting *Ripely v. Chater*, 67 F.3d 552, 557 n.22 (5th Cir. 1995)).

Based on the foregoing, the ALJ's RFC determination is supported by substantial evidence and Claimant's argument is without merit.

23

## VI. CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-29] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-33] be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 28th day of February 2014.

$Robt\ Jun\ Jr$

Robert B. Jones, Jr.
United States Magistrate Judge

24